WELCH, by guardian *ad litem,* Respondent, vs. MORTON
SALT COMPANY, Appellant.

*September 21—December 13, 1921.*

*New trial: Newly discovered evidence: Construction: Diligence:
Discretion of court.*

1. On a motion by plaintiff in a personal injury action for a new
   trial on the ground of newly discovered evidence, such evi-
   dence should be construed favorably to plaintiff in determin-
   ing the question whether, if true, it shows actionable negli-
   gence on the part of the defendant.
2. In an action for injuries sustained by a five-year-old boy by
   coming in contact with an auger salt conveyer in defendant's
   plant, where plaintiff, after a motion for nonsuit had been
   granted, moved for a new trial on the ground of newly dis-
   covered evidence, it was not an abuse of discretion to grant a
   new trial where the new evidence might show liability on the
   part of defendant.
3. The granting of a new trial is largely in the discretion of the
   trial court and will not be disturbed except for cogent reasons.

APPEAL from an order of the superior court of Douglas
county: SOLON L. PERRIN, Judge. *Affirmed.*

Action for personal injury sustained by plaintiff, an infant
of about five years of age, on August 23, 1919, at defend-
ant's salt works near Tower Bay Slip, Superior, by coming
in contact with an auger salt conveyer claimed to have been
left uncovered. Plaintiff was dumb and his hearing was
defective or entirely lacking. The day before the accident
he had been at the plant of the defendant and had been
chased out by defendant's employees over half a dozen times.
He persisted in coming back and was there at 6 o'clock when
defendant's foreman caught him, called up police headquar-
ters, and asked if any one was looking for a boy five or six
years old. Upon being told that no inquiries had come to
the police station the foreman started out with plaintiff in
his arms and after a number of inquiries was able to locate
his home at 432 Tower avenue, where he took the boy and

told his mother where he had been and that it was a dangerous place to be. The next day at about half-past 4 plaintiff again appeared in the cooper shop at the plant, and the evidence is that the foreman put him out and he went down the track. He next appeared in the sack room, where the foreman, Hangartner, and one Anderson were cleaning the machines with a steam hose. When discovered he started to crawl on top of the benches and play with the wheel of one of the machines. The foreman took him down and put him out through the door on the west side of the dock. The foreman soon after left the room for a few minutes and when he returned to the sack room he heard a scream. He ran back to the screw salt conveyer and found plaintiff with his foot in it. Such was the substance of the evidence as to the circumstances under which plaintiff was injured. At the close of the trial the court granted a motion for a nonsuit on the ground that no negligence on the part of the defendant had been shown.

Later plaintiff moved for a new trial on the ground of newly discovered evidence. The nature of such evidence is disclosed by the affidavits of Theodore Rask and Marion Rask, who claimed to have been present at the time of the injury but were not called as witnesses. The affidavits are as follows:

"Theodore Rask, being first duly sworn, on oath says that he resides in the city of Superior, Douglas county, Wisconsin,.and at number 1008 North 18th street; that he is in the employ of the Great Northern Railway Company as a freight conductor; that on the date of the accident and injuries to *Kenneth Welch* in the building of the *Morton Salt Company,* at Superior, Wisconsin, on or about August 23, 1919, this affiant was in said building; that affiant is the husband of Marion Rask, who formerly was employed at said *Morton Salt Company's* plant in the city of Superior, Wisconsin; that affiant came to call for his wife between 4 and 5 o'clock p. m. on the day of the accident; that when he came in the little *Welch* boy was in Jake Hangartner's arms and Jake then spoke to me and told me about the boy and showed

me the tag; he then set the boy down on the floor, the boy walked over by the conveyer and toward the drier room door. I saw the boy standing there looking into the drier room. I saw the auger conveyer at that time, and know it was not covered. In a few minutes after I heard the boy scream. Jake went over and was taking him out. I went over there and was present when Jake took the boy out. Mr. Luse came to our house some time in March, 1920, and I told him all I knew about the matter, as I have stated above; he said that made it look bad for the company. He inquired if we were going to be home right along so they could call us for witnesses if they needed us. I said we were, that we might be away for a short time. We were home all the time after that until the present, except a few days we were on a visit in Minneapolis. I didn't know of the case being tried until November 19, 1920, when my wife told me. I immediately phoned Mr. Crawford that we were witnesses. Mr. Luse had told us that Mr. Crawford was the attorney for Mr. Welch. Jake didn't at any time try to put the boy out while I was there."

"Marion Rask, being first duly sworn, on oath says that she resides at 1008 North 18th street in the city of Superior, Douglas county, Wisconsin, and is the wife of Theodore Rask; that on or about the 23d day of August, 1919, the date on which *Kenneth Welch* was injured in the building of the *Morton Salt Company,* at Superior, Wisconsin, this affiant was present; that affiant was formerly employed in the sewing or packing room of said plant of said company; that she had worked there in 1917 and part of 1918; that on the day of the accident she called at the plant to find out if they had installed the other machine in the packing room, as she intended to go to work there for a short while if they had. Affiant further says: I stood outside the packing room and watched two men using the steam hose cleaning in the packing room. While standing there Jake Hangartner came up and spoke to me, and he went into the packing room. I went right in after him. Jake talked to the men and I stood there until he got through. Just then the *Welch* boy came in and stood on the steps looking into the room; the boy came into the room. Jake told me that the boy was there the day before, Jake then talked to me, showing me the machine, and the boy climbed upon the table and played with the spout,

Jake took the boy down and stood him on the floor and continued showing the machine. The little boy came to where we were and started to take hold of the machine Jake was explaining and showing to me. Jake said the boy was very bright and fond of machinery. The girls I was acquainted with had gone home. I said then I'd go and write a note to the girls, I then went out and into the girls' cloak room. Jake came out with me, and the boy was right beside him. He either had the boy by the hand or the boy was walking close to him. Jake and the boy stood right close by the auger conveyer watching it as I went into the girls' room. I stood writing the note, looking out at Jake and the boy. I saw Jake stoop down and either take the cover off, or the cover was off the auger, and he stooped down to do something about the conveyer. I then came out and stood in front of the packing-room door where I could see the auger. Jake walked to me and the boy stood in front of the drier-room door, which was open, looking in at the drier, which was running. When Jake saw the boy hadn't followed him he waved at him to come, but the boy didn't see him, so he went and picked him up and carried him to where I was standing and showed me the tag on the boy. At that time the auger conveyer cover was off. Just at that time while Jake was showing me the tag on the boy my husband came in, as I had told him to call for me. Jake explained to my husband about the little boy, that he was there the day before, that he was deaf and dumb. The boy wanted to get down so Jake set him down. Jake stood him on the floor and was talking to us. The boy walked away and I didn't notice him, and in a few minutes I heard him scream and then the boy was in the conveyer. Jake did not at any time attempt or make any effort to put the boy out of the room while I was there. I was there from the time I first spoke to Jake until the accident—twenty, twenty-five minutes. Sometime in March, 1920, Mr. Luse came to our house and I told him all I knew about the matter, as I stated above. He said that looked bad for the company. He said they might need us for witnesses and they would call us if they'd need us. I was home during the time the case was tried and saw it mentioned in the newspapers. I expected to be called and later learned that the company won the case. My husband phoned Mr. Crawford November 19, 1920, stating to him that we

were there and knew about the accident. I thought I shouldn't go to court as a witness until we were called. Enoch came out and put the cover on the auger after the accident."

There were also affidavits by plaintiff's father and attorney setting forth the diligence used to obtain evidence. The substantive facts set forth in the affidavits of Theodore and Marion Rask as to how the injury occurred are denied in affidavits of Jacob Hangartner and C. Z. Luse.

The court held plaintiff had used due diligence to prepare for trial and granted the motion for a new trial because of the testimony to be given by the Rasks. From an order entered accordingly the defendant appealed.

For the appellant there was a brief by *Powell & Sprowls* of Superior, attorneys, and *Edward H. Stearns* of Chicago, of counsel; and the cause was argued orally by *Mr. John S. Sprowls* and *Mr. Stearns*.

For the respondent there was a brief by *Grace, Fridley & Crawford* of Superior, and oral argument by *W. P. Crawford*.

The following opinion was filed October 18, 1921:

VINJE, J. We shall not set forth the evidence as to the degree of diligence used by plaintiff to prepare for trial. Upon important points it is in conflict, and that being so it was especially a question for the trial court to decide. We cannot say there was an abuse of discretion in resolving that issue in favor of plaintiff.

The serious question in the case is whether the newly-discovered evidence, taken as true, shows actionable negligence on the part of the defendant. Such evidence is not as specific upon certain points as it should be and is susceptible of different interpretations. The trial court construed it favorably to plaintiff, as he had a right to do and should do upon such an application. We purposely forbear to express any opinion at this time upon the merits further than to

say that it may appear upon the next trial that plaintiff at the time of the injury was an invitee upon the premises and that the defendant failed to exercise the care it owed him as such or that it is otherwise liable.    Neither party should be foreclosed by expressions of opinion at this time because the new trial may develop a state of facts quite different from those considered upon this appeal.    Here the question is, Did the trial court abuse its discretion in granting a new trial?    We think not because the new evidence may show liability on the part of the defendant, and for that reason we cannot say there was any abuse of discretion.    The granting of a new trial is largely in the discretion of the trial court and will not be disturbed except for cogent reasons.   *R. Connor Co. v. Goodwillie,* 120 Wis. 603, 98 N. W. 528; *Eggen v. Fox,* 124 Wis. 534, 102 N. W. 1054; *Godfrey v. Godfrey,* 127 Wis. 47, 106 N. W. 814; *Bailey v. McCormick,* 132 Wis. 498, 112 N. W. 457; *Gross Coal Co. v. Milwaukee,* 148 Wis. 72, 134 N. W. 139.

*By the Court.*—Order affirmed.

A motion for a rehearing was denied, with $25 costs, on December 13, 1921.