CAROLINE KRIPPNER v. CECELIA MATZ AND ANOTHER. CHARLES SPILLANE, INTERVENER.[1]

June 30, 1939.

No. 31,920.

[1]Reported in 287 N. W. 19.

*Cobb, Hoke, Benson, Krause & Faegre, George Hoke,* and *Robert J. Christianson,* for appellants.

*Moonan & Moonan,* for intervener.

JULIUS J. OLSON, JUSTICE.

Defendants appeal from a judgment entered for intervener in the amount of $1,758.51, pursuant to findings by the court, and having as its background the following facts:

Seven negligence actions arose out of an accident taking place September 6, 1931, at a highway crossing when the automobiles driven by defendants came into collision causing injuries to their respective guest passengers. Five of these cases came into the hands of attorneys other than intervener. The total amount of damages claimed by them was $58,500. Intervener was retained in the other two cases, *i. e.,* Charlotte Krippner and the present plaintiff, Caroline Krippner. Caroline sought to recover $10,000, her sister Charlotte, $2,500. (Defendant Krippner is Caroline's brother-in-law, and Charlotte is his wife.) Each of defendants carried liability insurance with coverage limited to $10,000 for injuries to any one person, total coverage in any one accident, $20,000.

Pursuant to intervener's employment, he commenced an action for Caroline on October 7, 1931. (He also brought an action for Charlotte, but only Caroline's claim is presently involved.) His contract with Caroline provided that he was to receive—

"as compensation for the services" to be rendered "twenty-five per cent (25%) of any sums *received in settlement* of said claim against the two defendants if settlement was made before the trial of this action and thirty-three and one-third per cent (33-1/3%) of any sums *recovered in this action or received in settlement of any verdict recovered in this action."* (Italics supplied.)

The seven cases were all placed on the March, 1932, calendar for trial. The five first mentioned were consolidated for trial and were actually being tried when on the third day thereof a settlement was reached. Under the terms thereof the five plaintiffs were paid $13,650 by the insurance carriers, of which sum the insurer

for defendant Matz contributed $6,525 and Krippner's insurer $7,125.

Prior thereto, on November 21, 1931, plaintiff Caroline had executed a written dismissal "insofar as it affects or relates to Peter Krippner." This dismissal was "with prejudice and on the merits, but without costs. The suit is to stand in all respects against Cecelia Matz as if originally brought against her alone." This instrument was procured at her home in Cedar Rapids, Iowa.

On the day of settlement, March 16, 1932, a second dismissal was entered into under the terms of which plaintiff,—

"for a valuable consideration, including, among other things, the consummation this day of settlements of five cases on trial in the above court, in which [naming parties] are plaintiffs and the above named" [present defendants] "are defendants, it is hereby stipulated and agreed that the above entitled action may be, and the same hereby is, forever dismissed upon the merits and without costs and disbursements to any party."

This settlement was consummated at the courthouse where the five cases were then on trial. It came about because of the possibility of Peter Krippner being held to greater liability than his insurance coverage. Obviously neither defendants, their counsel, nor anyone else could predict what a jury might do in respect of which defendant was to be held liable. Either or both might be so held. There was real danger lurking, and it is easily conceivable that defendants and their counsel were seeking to find a safe way out of the difficulty. No money passed to either of the Krippner women. The insurance carriers refused to make the mentioned settlement unless all seven cases were disposed of. Hence it follows that the Krippner ladies surrendered their respective claims to make the settlement of the five cases possible of accomplishment. While the Krippner ladies were not informed of the amount included in the settlement nor of the policy limits nor had they consulted their lawyer about the affair, yet it clearly appears that an effort was made to get in touch with him; but, he being out of town and the settlement being urgent, it was accomplished in his absence and without his knowledge or consent. There is no claim of deceit

or fraud having been practiced nor was any finding made or asked for to that effect.

Intervener promptly petitioned the court to set aside the dismissals, ascertain the amount due him under his contract, and enforce his statutory lien. The court over defendants' objections granted the motion to set aside the dismissals and proceeded to hear the evidence offered.

Intervener's claim is based solely upon the ground that the settlement was made without his knowledge or consent; that under the attorney's lien statute he has an absolute right to recover under his contingent fee contract the 25 per cent therein provided. He asserts that the measure of his damages is the stipulated percentage of the value of his client's cause as of the time of settlement. In his own language his claim is thus stated: "Now, [in] this proceeding, if I have any right at all, I have a right on an express contract." The court was of opinion that "the value of the [intervener's] contract must be determined on the amount and extent of the defendants' liability" to plaintiff. Defendants' claim, urged throughout, was that the "attorney's compensation is his percentage of the amount for which the case was settled. There is no other test." Consequently, they say, by reason of plaintiff's voluntary relinquishment of her claim there was and is no basis for the application of the rule for which intervener contends, hence that no recovery can be had.

The court adopted intervener's views and found that the plaintiff's cause of action at time of settlement "was worth to exceed the sum of $5,000, and that it was worth to the defendants and to the insurers of the defendants, the sum of $5,000 to secure the dismissal of said actions." The court awarded him $1,250 with interest and costs, in all $1,758.51, the face of the judgment here for review.

■ Intervener's rights and remedies are governed by statute, 1 Mason Minn. St. 1927, § 5695, which as far as here material reads:

"An attorney has a lien for his compensation whether the agreement therefor be express or implied: * * *

"3. Upon the cause of action from the time of the service of the summons therein, or the commencement of the proceeding, and upon the interest of his client in any money or property involved in or affected by any action or proceeding in which he may have been employed, from the commencement of said action or proceeding, * * *."

Under subd. 6 it is provided that the lien "may be established, and the amount thereof determined, by the court, summarily, in the action or proceeding, on the application of the lien claimant or of any person or party interested in the property subject to such lien, * * *."

(Provision is also made for enforcing such lien by proceedings in equity for that purpose. But that is an alternative remedy and in no way limits the summary procedure quoted.)

This court has held that "the statute vests in the attorney a legal right to resort to the cause of action, or any settlement thereof without his consent, for his compensation." Davis v. G. N. Ry. Co. 128 Minn. 354, 358, 151 N. W. 128, 129. And in Miner v. C. B. & Q. R. Co. 147 Minn. 21, 23, 179 N. W. 483, 484, it was held that:

"The [attorney] intervener is interested in the original cause of action, by way of subrogation, to the extent necessary to protect his compensation." The proceeding need not be an original or independent action, for "he is enforcing his statutory right in the plaintiff's original cause of action, and is proceeding in the action which the plaintiff brought to enforce his cause of action."

■ Our cases hold that the parties to a cause may settle their differences notwithstanding the attorney's lien. In such event, however, the defendant is held liable to the attorney for the amount of his lien if settlement is made in disregard of the attorney's rights. The defendant in any such case is bound to take notice of the attorney's rights under his statutory lien. There are numerous cases upholding that view. Kubu v. Kabes, 142 Minn. 433, 437, 172 N. W. 496, 497, is illustrative, the court amongst other things saying:

"Although defendant had the right to make the settlement without consulting his [plaintiff's] attorney, and there was no purpose or design to defraud the attorney, for his own protection he was bound to guard against a possible second liability on the lien, precisely as he would in a transaction involving mortgaged property."

To the same effect is Wildung v. Security Mtg. Co. 143 Minn. 251, 254, 173 N. W. 429, 430, where the court held that defendants—

"were required to take notice of the lien rights which are given by the statute to attorneys, and for their own protection were bound to guard against a possible second liability under the lien, as they would be if the transaction involved mortgaged property."

For an interesting and instructive history of our statute with citation of authorities bearing thereon, see Byram v. Miner (8 Cir.) 47 F. (2d) 112.

We are therefore of opinion and so hold that intervener's lien under the statute was in full force and effect at the time of settlement and that the procedural steps taken by intervener are appropriate.

■ It has long been established law in this state, and elsewhere too,—

"that a client may, without the consent of his attorney, settle and compromise with his adversary all matters in litigation, in such manner and upon such terms as he may deem necessary for the protection of his interests. [Citing cases.] No vested right of the attorney is violated or impaired, and the rule applies notwithstanding an express agreement with the attorney that he will not settle or compromise without his consent or approval. [Citing cases.]" Southworth v. Rosendahl, 133 Minn. 447, 449, 158 N. W. 717, 718, 3 A. L. R. 468.

While there are authorities sustaining intervener's position, referred to in the case just cited, these were considered but held (133 Minn. 450, 451, 158 N. W. 718, 3 A. L. R. 468)—

"not in harmony with the trend of our own decisions upon the subject. In Gammons v. Johnson, 69 Minn. 488, 72 N. W. 563, a

case involving a settlement by the client without the consent of the attorney, it was held that the attorney was entitled to recover the reasonable value of his services but could not recover the agreed compensation. The contract there before the court was held void, as champertous, but that fact does not change the rule made the basis of the decision."

■ "The right of a client to discharge his attorney at his election, with or without cause, is universally recognized by the authorities. [Citing authorities.] If the client has the right to terminate the relation of attorney and client at any time without cause, then the contract differs from an ordinary contract of employment in that one of the parties thereto may put an end to the same, whether agreeable to the other party or not. If the client has this right as an implied condition of the contract under the law, it follows as a natural consequence that he cannot be compelled to pay damages for exercising that right which his contract gives him." Lawler v. Dunn, 145 Minn. 281, 284, 176 N. W. 989, 990.

And the opinion quotes with approval from Martin v. Camp, 219 N. Y. 170, 174, 175, 176, 114 N. E. 46, L. R. A. 1917F, 402, as follows [145 Minn. 284]:

" 'In such a case the attorney may recover the reasonable value of the services which he has rendered but he cannot recover for damages for the breach. of contract. The discharge of the attorney by his client does not constitute a breach of the contract, because it is a term of such contract, implied from the peculiar relationship which the contract calls into existence, that the client may terminate the contract at any time with or without cause. * * * and it follows from this rule, by necessary implication, that if the client has the right to terminate the contract, he cannot be made liable in damages for doing that which under the contract he has a right to do. * * *

" 'The rule secures to the attorney the right to recover the reasonable value of the services which he has rendered, and is well calculated to promote public confidence in the members of an hon-

orable profession whose relation to their clients is personal and confidential. * * *" "

■ The court in its findings says that the evidence taken in the five cases on trial when the settlement was reached "established" defendants' negligence; that the actual damages suffered by said plaintiffs—

"exceeded * * * the amount paid in settlement thereof, and that it was the duty of the insurance companies who were defending said actions to settle said actions * * * without requiring plaintiff [Caroline Krippner], as a condition [to] their making said settlement, to surrender her cause of action which was worth $5,000, but the insurers used the possibility of an excess recovery against Peter Krippner * * * to get the plaintiff to release her cause of action, by refusing to make this settlement unless plaintiff would release her cause of action."

The court apparently put the insurance companies on trial. They are not parties. Are attorneys for insurance underwriters precluded from exercising the same rights as are freely granted and exercised by counsel for other litigants? True, the attorneys retained and paid by the underwriters appeared for defendants, but that was pursuant to the policy contracts so to do. Be that as it may, the theory adopted by the court as to intervener's compensation seems utterly wrong. If the five plaintiffs received less than their actual damages, how can it be said that intervener is entitled to 25 per cent of $5,000? Who can tell at this stage what the "actual damages" of the five plaintiffs were? The court thinks they did not get enough. Who is to say now what would be adequate? If Caroline had settled for a nominal sum, say $100, could intervener nevertheless proceed as here and recover any such sum as here allowed him? This court in the case of Davis v. G. N. Ry. Co. 128 Minn. 354, 359, 151 N. W. 128, 130, said: "We sustain the contention of defendant that the amount of the settlement must be taken as a basis from which to compute the attorneys' fees." And this seems to be the only practical rule to apply if we are to hold, as has been heretofore held, that the client's right to settle his

cause upon such terms as to him seems best is absolute. Southworth v. Rosendahl, 133 Minn. 447, 158 N. W. 717, 3 A. L. R. 468.

The settlement is final and conclusive as to the parties. As such it must stand. The five plaintiffs who shared in the settlement have the undoubted right to retain what they received. The same is true respecting the attorneys' fees incurred and paid by them more than seven years ago. Upon what basis then can a computation of intervener's rights be made? Is it possible to reopen the settlement so that the sum paid for his client's interest may be computed? Of course not. The settlement was in a lump sum (except as to a minor plaintiff whose portion was separately treated, the approval of the court being essential to a valid settlement). Undoubtedly their counsel have long ago settled the litigation, and the rights of all of them is a past and irrevocable event.

We think it is a misconception to attempt to force an agreement between an attorney and his client into the conventional modes of commercial contracts. While such a contract may have similar attributes, the agreement is, essentially, in a classification peculiar to itself. Such an agreement is permeated with the paramount relationship of attorney and client which necessarily affects the rights and duties of each. As we have seen, despite the agreement but as an incident to the relationship, a client has full power to discharge his attorney without cause at any time, being liable only in such event for the reasonable value of the services rendered. Lawler v. Dunn, *supra*. In addition, a client has the undoubted right, absent fraud or collusion, to settle his cause with his opponent without the consent of his attorney. Southworth v. Rosendahl, *supra*. And a stipulation in a contingent fee agreement requiring the consent of the attorney as a prerequisite to settlement is void as against public policy because it stifles settlement and removes control over the cause from the client. Davis v. G. N. Ry. Co. *supra*. The cause being that of the client, it necessarily follows, under the contract here involved and the facts here presented, that intervener is limited to a *quantum meruit*. If there had been an ascertained amount due to or paid to plaintiff, then clearly intervener's right under his contract and the statutory lien given in

aid thereof would entitle him to "25% of any sums received in settlement of said claim." That is what was held in the Davis case and in many other cases, including Miner v. Payne, 150 Minn. 103, 184 N. W. 673, and Dell v. Marckel, 184 Minn. 147, 238 N. W. 1.

Here, as in the Southworth case (133 Minn. 452, 158 N. W. 719, 3 A. L. R. 468), intervener "cannot recover the agreed compensation." He is "limited to the reasonable value" of his services, "which cannot be recovered in this action, for the complaint is not so framed. Yet the judgment to be rendered herein will not defeat a subsequent action therefor. Leonard v. Schall, 132 Minn. 446, 157 N. W. 723, 4 A. L. R. 1166."

The meat of that decision is contained in the syllabus paragraphs of the court (133 Minn. 447-448, 158 N. W. 717, 3 A. L. R. 468) as follows:

"The relation of attorney and client does not preclude the latter from settling and compromising the matters in litigation in his own way, and without the knowledge or consent of the attorney, and by so doing he does not subject himself to the payment to the attorney of a contingent fee agreed upon in case of the successful outcome of the case.

"Where the client exercises his legal right to settle with his adversary, in good faith and without purpose to defraud the attorney out of his compensation, the latter may recover only the reasonable value of the services rendered by him down to the time of the settlement."

It follows that the judgment must be reversed. Upon the pleadings and facts here appearing there can be no recovery.

So ordered.

PETERSON, JUSTICE (dissenting).

If a finding that the dismissal was fraudulent as to intervener was necessary in order to sustain the judgment, we may, under our decision in Penn Anthracite Min. Co. v. Clarkson Sec. Co. 205 Minn. 517, 287 N. W. 15, affirm on that ground without such a finding below since the uncontradicted evidence compels such a

finding. In the cited case we put our decision on the grounds of fraud, although fraud was not found below, upon the theory that we had the power to determine that fact if necessary to affirm. So we may do likewise in the instant case.

The whole transaction was permeated with fraud, deceit, and violation of the rules of professional conduct by counsel, to procure the dismissal and engineer the settlement. Counsel's conduct toward intervener was deceitful and misleading throughout for the purpose of putting over this deal conceived many months before it was consummated. Although counsel for Peter Krippner obtained a dismissal from Caroline as to his client on November 21, 1931, behind intervener's back, he did not advise intervener of that fact nor did he then file the dismissal and take his client out of the case. On the contrary, he maintained a silence presaging what happened later. Intervener went ahead with his preparation for trial and served notice of trial on counsel, of which he admitted service and which he returned with a letter on February 27, 1932, closing with the words "with all good wishes," despite the fact that counsel then had in his possession the dismissal, which he had been holding for over three months and was waiting the opportunity to use against intervener. The business between intervener and counsel proceeded upon the assumption that the case was to be tried, and counsel's assurances were disarming of anything to the contrary.

It was necessary to obtain a dismissal from Caroline as to the other defendant in order to carry out the plan as conceived. But to get it, that was the question. Counsel did not have the hardihood to attempt direct communication with Caroline while intervener was present. So this dismissal also was to be obtained behind his back by direct negotiation with Caroline. They went on with the trial, which was characterized by much delay and stalling, which is explainable only in the light of what happened afterwards. On the third day of the trial intervener was absent from Waseca, where the trial was held and where he had his office. That presented the occasion for putting over a fraud on Caroline, which

would not have been successful if intervener had been present to advise her.

Counsel got together with plaintiff and the other parties. Caroline's uncontradicted testimony shows fraudulent representations relating to the amount of insurance coverage, their ability to settle, the amount of the settlement, and the effect of failure to settle. They told her that the total insurance coverage was $20,000. In fact it was $40,000. They told her that the cases of plaintiffs other than Caroline could not be settled for less than $25,000, whereas they could have been settled, as they were, for $13,650. She was led to believe that the amount of the settlement was $25,000 and not the lesser amount actually paid. In addition, they "scared" her and told her that if she did not settle she and her husband would lose their farm and everything. Plaintiff was credulous and ignorant of her rights. The fraudulent scheme embraced obtaining a dismissal from Caroline and nonpayment of intervener's fees.

Such settlements directly with clients represented by counsel have been condemned by us and other courts as fraudulent on counsel. In Desaman v. Butler Brothers, 118 Minn. 198, 203, 136 N. W. 747, 748, 749, Ann. Cas. 1913E, 642, in speaking of a settlement and payment of a judgment by direct negotiation with plaintiff without his attorney's knowledge and consent, we said:

"It may be said that the very fact of making a settlement behind the back of the attorney suggests collusion. An attorney is the legal adviser and confident of his client. The other party to the litigation knows that. He also knows that, when it comes to such an important stage of the suit as a compromise, the client needs the advice and counsel of his attorney, especially when the question is a large reduction of a favorable verdict. He should further know that the attorney, by virtue of his lien, is entitled to be considered. Fairness and common honesty would indicate that settlements of lawsuits should not be engineered in the dark, so as to permit an irresponsible or dishonest party to get away with the fruits of the attorney's work without payment for the services."

But bad as was the unprofessional conduct of obtaining the settlement from Caroline behind intervener's back, it is rendered still worse, if that be possible, by the use which was subsequently made of it. Conceding that she had the undoubted power to dismiss, subject to intervener's lien, how can it be said that this is such a case? If her dismissal was *bona fide,* it would have been filed and Peter Krippner would have been out of the case. But the dismissal was used to obtain dismissals and settlements of other cases, to which Caroline was not a party and which were no concern of hers. Her dismissal was not a *bona fide* exercise of her right to dismiss, but part of a fraudulent transaction engineered by counsel to settle all the cases. Counsel should not be permitted to use a dismissal in one case to force settlements in other cases to which the party giving the dismissal is not a party.

Of counsel for appellants, only Mr. Hoke appeared below. His firm represented defendant Matz's insurer. In his affidavit he stated that he took no part in the negotiations for the dismissal and that his only part in the transaction was dictating the dismissals, which were signed by the parties. But his affidavit also shows that his client refused to settle at all unless plaintiff's claim was made part of the settlement. It was clear to him that the settlement was made direct with plaintiff in intervener's absence. When the case is viewed in the light of all the evidence, the inference is inescapable that his client knew that the settlement was a fraud on intervener.

■ In my judgment, the question of the client's power to settle his case with his adversary without the attorney's consent is not involved here. The contract provides for such a contingency. Intervener was to have 25 per cent of any sums received in settlement if settlement were made before trial, which is the case here, and 33-1/3 per cent of any sums recovered in the action or received in settlement of any verdict recovered therein. The contract fixed intervener's compensation in the event of settlement before trial.

The agreement in question is one which the parties had a right to make. 2 Mason Minn. St. 1927, § 9470, provides: "A party shall have an unrestricted right to agree with his attorney as to his com-

pensation for services, and the *measure* and *mode* thereof  * · *  *."
An agreement between a client and his attorney that the latter shall
receive a certain percentage of any amount recovered by settlement
or suit is legal and enforceable. In Johnson v. G. N. Ry. Co. 128
Minn. 365, 151 N. W. 125, L. R. A. 1917B, 1140, entirely ignored
by the majority, plaintiff agreed to pay his attorneys 33-1/3 per
cent of any amount recovered by settlement or suit, plus any sums
advanced by them to him. Defendant settled with plaintiff for
$4,500. The attorneys instituted proceedings against defendant to
enforce their lien for the amount due them under the contract with
their client, *viz.*, one-third of the amount received in settlement plus
the $500 advanced him, a total of $2,000. We held that the attor-
neys were entitled to the amount due them under the contract
without showing that the settlement was fraudulent and that they
had a lien under the statute against defendant for the compensation
so due to them. See In re Disbarment of Greathouse, 189 Minn. 51,
at page 56, 248 N. W. 735.

Even where the parties contract for stipulated sums to be paid
the attorney in case the client breaks the contract, the attorney may
recover the stipulated compensation upon the theory of liquidated
damages. Sierzek v. Smith, 86 Okl. 79, 206 P. 611. See 7 C. J. S.,
Attorney and Client, § 181, n. 65.

The majority opinion by denying intervener the right to be com-
pensated under his contract in effect nullifies the statute giving
him that right and overrules our decision in Johnson v. G. N. Ry.
Co. *supra,* without even mentioning it.

■ In Johnson v. G. N. Ry. Co. *supra,* defendant paid the amount
given in settlement directly to plaintiff. Here the payment was to
the plaintiffs in the other actions with Caroline's consent. But
what difference does it make? The unchallenged finding is that
plaintiff's dismissal was part of the consideration for the payment
of the $13,650 to the other claimants with her consent. Although
payment was made to plaintiffs in the other actions the payment
included settlement of Caroline's claim. The recipients were simply
her nominees to receive payment. The court found upon ample
evidence that plaintiff's claim was worth $5,000. That was part of

the $13,650, and while the settlement itself did not show the fact by separating and segregating the amount of each claim, the finding below has done that so as to show what presumably was paid for plaintiff's claim. It is to be remembered too that affidavits for defendants show that they claimed they were not liable on any of the claims and refused to settle unless plaintiff's claim was included in the settlement. It makes no difference whether the consideration be given to the promisor or some other person. Van Eman v. Stanchfield, 10 Minn. 197 (255); Harriet State Bank v. Samels, 164 Minn. 265, 204 N. W. 938; Restatement, Contracts, § 75(2).

Where releases are given by A and B in settlement of their separate causes of action against C, who with A's consent pays the entire consideration for the releases to B, A is deemed to have received the benefit of the payment. West v. Kidd, 184 Minn. 494, 239 N. W. 157; Hanson v. Northern States Power Co. 198 Minn. 24, 268 N. W. 642.

In both of the cases cited a husband and wife gave releases of their causes of action, and the entire consideration was paid to the husband with the wife's consent. We held that payment to the husband was a consideration to the wife. In West v. Kidd, we said that by joining with her husband in releasing both causes of action she obtained for her husband a settlement of the defendant's alleged liability and the payment to the husband was [184 Minn. 496, 239 N. W. 158] "not less a consideration sufficient to support the release than would be a benefit running directly to her."

Furthermore, that is what the parties intended. Caroline's uncontradicted testimony is that she brought up the matter of intervener's fees and that she was told: "Well, you can put all the money together, you all got a little money, and you can pay your attorney out of that." The view there expressed accords with the legal view that the money paid was chargeable with intervener's fees. Since defendants failed to respect the attorney's lien, it should be enforced against them as it was in the Johnson case.

■ Attorneys at law are required to conform to the ethics of the profession in order that the courts and those who participate in the

administration of justice may command that confidence and respect which is essential to the performance of that function. Failure to observe the prescribed standards of conduct is bound to bring reproach upon both the bar and the courts which tolerate the unethical conduct. In the cases of In re Disbarment of Greathouse, 189 Minn. 51, 248 N. W. 735, and In re Disbarment of McDonald, 204 Minn. 61, 282 N. W. 677, 284 N. W. 888, we disciplined attorneys for professional misconduct consisting of the solicitation of legal business solely upon the grounds that such conduct violated accepted standards of ethical conduct. In each case, quite different from the conduct involved here, there was no claim of fraud, overreaching, or dishonesty, but, on the contrary, it was conceded that the attorney was able, honest, and loyal and that his services were entirely beneficial to those whom he represented. In the Greathouse case the attorney was severely censured. We said [189 Minn. 61, 248 N. W. 740]: "A continuation and approval of such conduct dooms the destiny of the legal profession." In McDonald's case the attorney was disbarred.

If the Greathouse and McDonald cases hold anything they hold that the canons of legal ethics so far partake of the nature of law that attorneys will be compelled to obey and that courts will discipline them for disobedience. While these cases involved a consideration only of the ethics relating to solicitation of business by lawyers, other courts have adopted the canons of ethics as the standard of conduct of counsel in respect to the matter of direct communication with a party represented by counsel and making settlement of a case with the party without the knowledge and consent of his counsel. There is no reason why the canons of ethics should not apply in the one case as in the other.

Perhaps no rule is better established than that attorneys should not communicate or directly deal with a party who is represented by counsel. He who violates the rule thereby puts his conduct under a cloud. In Desaman v. Butler Brothers, *supra,* we said that the very fact of making a settlement behind the back of an attorney suggests collusion. In In re Oliver, 2 Ad. & Ell. 620, Lord Denman held that the mere fact that an attorney obtained the signature

of a woman 75 years old to a paper by direct communication with her while she was represented by counsel was sufficient ground for ordering him to surrender the paper. He said [2 Ad. & Ell. 622]:

"When it appeared that Mrs. Oliver had an attorney, to whom she referred [as is the fact here], it was improper to obtain her signature, with no attorney present on her part. If this were permitted, a very impure, and often a fraudulent, practice would prevail."

The Canons of Professional Ethics of the American Bar Association proscribe not only direct communication with a party represented by counsel, but an attorney's permitting his clients and their agents to do so. Canons 9 and 16 read:

"9. *Negotiations with opposite party.* A lawyer should not in any way communicate upon the subject of controversy with a party represented by counsel; much less should he undertake to negotiate or compromise the matter with him, but should deal only with his counsel. It is incumbent upon the lawyer most particularly to avoid everything that may tend to mislead a party not represented by counsel, and he should not undertake to advise him as to the law."

"16. *Restraining clients from improprieties.* A lawyer should use his best efforts to restrain and to prevent his clients from doing those things which the lawyer himself ought not to do, particularly with reference to their conduct towards courts, judicial officers, jurors, witnesses and suitors. If a client persists in such wrongdoing the lawyer should terminate their relation."

Rule VII(a) of Professional Ethics of the Minnesota State Bar Association is the same in substance as Canons 9 and 16. Hoffman's Resolution XLIII was:

"I will never enter into any conversation with my opponent's client, relative to his claim or defense, except with the consent and in the presence of his counsel."

In the case of In re O'Neil, 228 App. Div. 129, 239 N. Y. S. 297, 300, the attorney was president and general counsel of an insurance

company. He was charged with violating Canons 9 and 16 of Professional Ethics of the American Bar Association by approving settlements through agents and employes of his company directly with claimants represented by counsel. The court found the charges not proved, but it held that a lawyer who goes into business must so far as he discharges any duties in connection with the employment of a legal nature conform his conduct to the canons of ethics and that a violation of the rules renders him subject to discipline. Dowling, P. J. said [228 App. Div. 131]:

"Apparently, however, some of the company's employees undertook to determine not only the fact of the retainer of an attorney by the claimant, but also the extent to which such a retainer should be recognized or respected, if there was a chance to settle the claim for a small amount. Of course they had no such right. Where a claimant had retained an attorney to the knowledge of the company, and particularly if its files disclosed notice of suit brought by such attorney or of the fact of his retainer, no one was entitled to disregard it. And if this record showed that respondent had personal knowledge of an improper practice in that regard, he would be answerable, whether as an attorney who was general counsel to his company, or as an attorney who became president thereof and directed its affairs."

An attorney representing a plaintiff was held subject to discipline and reprimanded for settling an action directly with the defendant, who was represented by counsel, without his counsel's knowledge and consent, in the case of In re Atwell, 232 Mo. App. 186, 115 S. W. (2d) 527. I have been unable to find any case that adopts a contrary view. See 7 C. J. S., Attorney and Client, § 23, p. 751, n. 62.

We cannot give approval to the conduct here involved without turning our backs on our declarations in the Greathouse and McDonald cases, that the basis of our decisions was the maintenance of the rules of professional ethics. After all, the rules are adopted and enforced for the protection of the courts and the bar as a whole and not for a particular class or group. We enforce the

canons against solicitation not to protect those against whom solicited cases are brought, but to maintain professional standards indispensable to the administration of justice. But it is just as essential that all the rules be observed. All professional misconduct is evil. As declared in the preamble to the Canons of Professional Ethics of the American Bar Association: "It is peculiarly essential * * * that the public shall have absolute confidence in the integrity and impartiality of its administration." But how can we say that the rules of ethics shall apply in some cases and not in others without rendering ourselves subject to the charge that we have not been impartial in the matter? We should not make fish of some and fowl of others. The rules of ethics should be rigidly enforced against the most able or prominent as well as the least able and most insignificant members of the bar. Only in that way can the practice of law retain its professional, as distinguished from a business, status. There are some who say that the practice of law is a mere business and not a profession. When we become convinced that this is true, we should candidly admit the fact. Then adherence to the canons of ethics will become, as I believe professed adherence without impartial enforcement now is, so much false pretense and formal cant.

The judgment should be affirmed on the authority of Johnson v. G. N. Ry. Co. *supra,* alone. Attorneys should be protected in rendering honest service, which is indispensable to the protection of private and public rights and the administration of justice. They should not be made outlaws in the courts wherein they serve and which they uphold. Nor should rules of ethics be enforced as to one group and not as to others. Intervener honestly earned his fee under his contract, which is explicitly authorized by statute. The right to the fee is protected by the attorneys' lien statute. I see no good reason why his rights should not be respected and enforced.

MR. CHIEF JUSTICE GALLAGHER took no part in the consideration or decision of this case.

MR. JUSTICE HILTON, being incapacitated by illness, took no part.