**In the Matter of QWEST'S PER-FORMANCE ASSURANCE PLAN.**

**In the Matter of Qwest's Wholesale Quality Standards.**

**No. A09–1493.**

Court of Appeals of Minnesota.

June 8, 2010.

Karen Finstad Hammel, Assistant Attorney General, St. Paul, MN, for relator Minnesota Department of Commerce.

Jeanne M. Cochran, Assistant Attorney General, St. Paul, MN, for respondent Minnesota Public Utilities Commission.

Considered and decided by SCHELLHAS, Presiding Judge; LANSING, Judge; and HALBROOKS, Judge.

## OPINION

SCHELLHAS, Judge.

Relator Minnesota Department of Commerce challenges respondent Minnesota Public Utilities Commission's decision regarding the disposition of the balance remaining in the Tier 2 Special Fund under Qwest's Performance Assurance Plan. Relator argues that respondent's decision to distribute the money to K–12 schools in the form of telecommunications grants contravenes Minn.Stat. § 16A.151, which relator argues requires respondent to deposit the balance of money into the state's general fund. We affirm.

## FACTS

The issues in this appeal stem from the relationship between Qwest and competitive local exchange carriers (CLECs) in Minnesota. Congress provided a framework for this relationship in the Telecommunications Act of 1996, 47 U.S.C. §§ 151–615b (2006) (the 1996 Act or the Act). The supreme court has explained the Act as follows:

> Congress passed the 1996 Act in an effort to foster competition in telecommunications markets, including local telephone markets. Until the 1996 Act was passed, states had the power to grant exclusive franchises to incumbent carriers, thereby creating a monopoly in

each local telephone service area. The Act ended the long-standing state-sanctioned monopolies and fundamentally restructured local telecommunications markets. The Act's purpose is to "promote competition and reduce regulation in order to secure lower prices and higher quality services for American telecommunications consumers and encourage the rapid deployment of new telecommunications technologies." Telecommunications Act of 1996, Pub.L. No. 104–104, purpose statement, 110 Stat. 56, 56 (1996). Because of the high cost of building a new telecommunications network infrastructure, the Act requires incumbent carriers, who own the existing infrastructure, to enter into agreements with CLECs that allow the CLECs to interconnect with the incumbents' existing networks and to purchase or lease telecommunications services and facilities at wholesale rates for resale to the CLECs' customers. 47 U.S.C. § 251(c)(2) (2000).

*In re Qwest's Wholesale Serv. Quality Standards,* 702 N.W.2d 246, 248–49 (Minn. 2005) (*Qwest's WSQ Standards* ).

▮▮▮▮ The Act also provides that any Bell operating company, including Qwest as successor to U.S. West Communications Co., is barred from providing interLATA (long-distance) service originating from the regions in which it is the incumbent carrier without the approval of the Federal Communications Commission (FCC). 47 U.S.C. §§ 153(4), (21), 271(a), (b); *Qwest's WSQ Standards,* 702 N.W.2d at 249. In order to approve such an application, the FCC must find that "the requested authorization is consistent with the public interest, convenience, and necessity," and that the Bell operating company is offering access and interconnection to its network for CLECs, including compliance with a 14–point "competitive checklist." 47 U.S.C.

§ 271(c), (d)(3). In evaluating section–271 applications, the FCC relies on Performance Assurance Plans (PAPs), which are developed collaboratively by the Bell operating companies, CLECs, and state regulatory bodies such as respondent, "to ensure the nondiscriminatory provision of wholesale local exchange services." *Qwest's WSQ Standards*, 702 N.W.2d at 249. While the FCC does not require a mechanism such as a PAP as a condition of section–271 approval, it "strongly encourages" such mechanisms, which are "probative evidence" that the applicant "will continue to meet its section 271 obligations and that its entry would be consistent with the public interest." *In re Application by Bell Atl. N.Y. for Authorization under Section 271 of the Commc'ns Act to Provide In-region, InterLATA Serv. in the State of N.Y.*, 15 F.C.C.R. 3953, 4164–65 (1999) (*Bell Atl. N.Y.*).

The Act requires the FCC to consult with the communications regulatory commission of the state that is the subject of a section 271 application to verify that the Bell operating company is meeting the prerequisites for approval. 47 U.S.C. § 271(d)(2)(B). Though U.S. West, as predecessor to Qwest, had not yet applied to the FCC to enter the long-distance market, on October 31, 1996, respondent initiated a proceeding to "develop the record it will need to discharge its responsibilities under § 271." Respondent ordered Qwest to file its proposed PAP with respondent for consideration in relation to respondent's section 271–compliance review. Qwest did so, and respondent considered Qwest's PAP as well as two other proposed PAPs before approving a PAP for Minnesota (the MPAP) on July 29, 2002. Qwest filed its application to provide long-distance service with the FCC on March 28, 2003, and the FCC approved the application on June 25, 2003, in reliance on the MPAP, among other things. *In re Appli-cation by Qwest Commc'ns Int'l., Inc., for Authorization to Provide In–Region, InterLATA Servs. in Minn.*, 18 F.C.C.R. 13323, 13360 (2003) (stating that "the PAP that will be in place in Minnesota provides assurance that the local market will remain open after Qwest receives section 271 authorization in this state").

The MPAP helps to foster competition by requiring Qwest to maintain a certain level of parity between the quality of service it provides to its competitors and the quality of service it provides for its own retail operations. The MPAP coexists with the Wholesale Service Quality (WSQ) rules, which provide fixed performance goals with which Qwest must comply, rather than the "parity standard" provided by the MPAP. CLECs may opt into the MPAP, rather than the WSQ standards, when making an interconnection agreement with Qwest. The MPAP provides that "[i]n electing the MPAP, CLEC shall surrender any rights to remedies under [the WSQ] rules (in that regard, this MPAP shall constitute an 'agreement of the parties' to opt out of those rules)." By its own terms, the MPAP is a voluntary agreement between Qwest and a contracting CLEC that elects to include the MPAP in its interconnection agreement.

When Qwest fails to provide wholesale service that meets the relevant standards to a competitor that has adopted the MPAP into its interconnection agreement, the MPAP provides self-executing remedies by directing Qwest to make two types of payments. Tier 1 payments go directly to the CLEC that is harmed by Qwest's noncompliance. Tier 2 payments go into the Tier 2 Special Fund, which is used for administration of the MPAP including paying a technical advisor or consultant, audits of Qwest's performance measurement and reporting, and other administrative expenses. Even if a particular CLEC

does not opt into the MPAP, "Qwest shall be responsible for making payments to the Tier 2 Special Fund ... for the wholesale performance provided to that CLEC." The MPAP provides that respondent shall determine how to use any balance remaining in the Tier 2 Special Fund after paying for administration. The MPAP requires that the uses selected by respondent "be competitively neutral efforts in the telecommunications field that do not benefit Qwest directly."

The MPAP provides a dispute-resolution process under which disputes are initially heard by an administrative-law judge (ALJ) to be paid from the Tier 2 Special Fund, with a right to appeal to respondent, followed by an appeal "to federal court under the standard in the Federal Arbitration Act."

The MPAP vests respondent with authority to make modifications to its terms after a review process on a semiannual basis. Any disputed issues that arise in the process of such a review are subject to "a proceeding" if "applicable and appropriate." But the MPAP also states that "[n]othing in this MPAP precludes [respondent] from modifying the MPAP based upon its independent state law authority, subject to judicial challenge."

On February 14, 2008, respondent issued an order requesting comments on the disposition of the balance of money in the Tier 2 Special Fund. Qwest suggested that respondent distribute the balance "for telecommunications purposes to K–12 educational institutions throughout the state via a grant process." According to Qwest, the Tier 2 Special Fund contained "upwards of $2 million dollars ... that could be used to benefit students throughout the state." Relator opposed Qwest's suggestion, arguing that Minn.Stat. § 16A.151 required that the balance of money be deposited in the state general fund. After

requesting and considering further legal analysis and comment on the issue, on April 21, 2009, respondent issued an order authorizing disposition of the funds consistent with Qwest's suggestion. Respondent denied relator's petition for reconsideration, and this appeal follows.

## ISSUES

I. Did respondent err by concluding that Minn.Stat. § 16A.151 did not require that the balance of the Tier 2 Special Fund be deposited in the state general fund?

II. Was respondent's decision a departure from its precedent and, if so, was its departure arbitrary and capricious?

## ANALYSIS

Relator argues for reversal of respondent's decision to authorize the distribution of the balance of money in the Tier 2 Special Fund to K–12 schools through a grant program. On review of a decision of the Minnesota Public Utilities Commission, this court may affirm the decision; remand the case for further proceedings; or reverse or modify the decision if the substantial rights of the relator may have been prejudiced because the commission's findings, inferences, conclusion, or decision are, among other things, in excess of the commission's statutory authority, affected by error of law, or arbitrary and capricious. Minn.Stat. §§ 14.69, 216B.52, subd. 1 (2008).

## I. Minn.Stat. § 16A.151

■ Relator argues that under Minn. Stat. § 16A.151, the balance of money in the Tier 2 Special Fund must be deposited in the state's general fund. Resolution of this issue turns on the meaning of the words in the statute, which presents a question of law that we review de novo.

*St. Otto's Home v. Minn. Dep't of Human Servs.*, 437 N.W.2d 35, 39–40 (Minn.1989).

Section 16A.151 provides that "[m]oney recovered by a state official in litigation or in settlement of a matter that could have resulted in litigation is state money and must be deposited in the general fund." Minn.Stat. § 16A.151, subd. 1(c). For the purposes of section 16A.151, "'litigation' includes civil, criminal, and administrative actions; ... 'money recovered' includes actual damages, punitive or exemplary damages, statutory damages, and civil and criminal penalties; and ... 'state official' means the attorney general, another constitutional officer, an agency, or an agency employee, acting in official capacity." *Id.*, subd. 3. An exception applies when "a state official litigates or settles a matter on behalf of specific injured persons or entities," in which case the official may distribute the money to those specific injured persons or entities. *Id.*, subd. 2(a).

In its decision, respondent concluded that section 16A.151 did not apply because "the MPAP's Tier 2 Special Fund did not result from litigation by state officials, or the settlement of such litigation." Respondent noted that "the MPAP arose in the context of Qwest's anticipated § 271 petition to the FCC," that Qwest's decision to file the MPAP was voluntary, and that respondent's role was merely to provide comments to the FCC with respect to Qwest's application. The order states, "Because the MPAP did not arise from any legal duty owed to the state, the proceeds of the Tier 2 Special Fund could not have resulted from litigation for breach of such a duty, or in settlement of such litigation."

Relator first argues that respondent's decision was incorrect because the MPAP has already been the subject of litigation within section 16A.151's definition and has the potential to be the subject of future litigation. Relator notes that respondent initiated a proceeding to establish WSQ standards in 2000, and that proceeding included consideration of Qwest's proposed PAP, which Qwest wanted respondent to adopt as the state's permanent WSQ plan. Relator argues that "[t]here remains the potential for future litigation challenging any MPUC decision that makes modifications to the plan," and that "since the MPAP both is an alternative to the WSQ standards and an agreement which the MPUC has stated that it has the authority to modify, there is potential for additional litigation of the MPAP."

Relator also argues that resolution of the MPAP proceeding, with modifications agreed to by Qwest, constitutes a "settlement" because it was "a negotiated resolution to ensure performance." Relator notes that in *Qwest's WSQ Standards*, 702 N.W.2d at 262, the supreme court held that respondent lacks authority to impose self-executing remedies. Relator argues that had Qwest refused to *voluntarily* include self-executing remedies as part of the MPAP, respondent might have refused to endorse the plan, on which Qwest appears to have been counting for its section 271 application. Relator further argues that if the MPAP had been adopted without the self-executing remedies, the state would have had to enforce compliance with the plan through a district court action under Minn.Stat. § 237.461, subd. 1 (2008), which provides an enforcement mechanism for "rules and orders" made under respondent's statutory authority. According to relator, Qwest's agreement to the self-executing remedies was in effect a settlement avoiding the risk of respondent refusing to endorse the MPAP in support of Qwest's section 271 application, and avoiding district-court litigation to enforce the MPAP once approved.

We agree with relator that the proceedings to finalize an MPAP and prepare a record for respondent's section 271 comments to the FCC constitute an "administrative action," and therefore "litigation," within the meaning of section 16A.151. But the money deposited into the Tier 2 Special Fund was neither recovered in that litigation nor recovered "in settlement of a matter that could have resulted in litigation," because the MPAP was not a "settlement" within the meaning of section 16A.151.

A settlement is "[a]n agreement ending a dispute or lawsuit." *Black's Law Dictionary* 1496 (9th ed. 2009). The MPAP in this case was not created or adopted to resolve a dispute or lawsuit. Variations were suggested by Qwest and CLECs, and a final version was adopted, after comment and modification, by respondent. But the MPAP was not adopted by respondent to resolve any dispute between Qwest and the CLECs—it was intended to support Qwest's section 271 application to the FCC to enter the long-distance market. In fact, Qwest made clear in its submissions to respondent that it was not subjecting itself to the terms of the MPAP until its section 271 application was approved. And Qwest's agreement to the MPAP did not preempt any litigation—Qwest was free to submit its application to the FCC with a PAP different than that approved by respondent, or with no PAP at all. In a submission to respondent, Qwest stated:

> The FCC has never required Bell Operating Company ("BOC") applicants to demonstrate that they are subject to performance monitoring and enforcement mechanisms as a condition of section 271 approval. However, where a BOC has voluntarily provided a [PAP], the FCC has stated that these mechanisms would constitute "probative evidence" that the BOC will continue to meet its section 271 obligations and that

its entry would be consistent with the public interest.

Qwest's inclusion of a PAP approved by respondent may have strengthened its section 271 application, but Qwest was not required to include one. *See Bell Atl. N.Y.*, 15 F.C.C.R. at 4164–65 (stating that while the FCC does not require a mechanism such as a PAP as a condition of section 271 approval, it "strongly encourages" such mechanisms, which are "probative evidence" that the applicant "will continue to meet its section 271 obligations and that its entry would be consistent with the public interest").

Relator in effect argues that the MPAP was an agreement ending the "dispute or lawsuit" that was the Minnesota Public Utilities Commission proceeding that existed solely to prepare respondent to submit comments to the FCC in support of Qwest's section 271 application. But this is no more a "settlement" than is a final set of contract terms following protracted negotiations between two parties to a business transaction. In such a circumstance, the transaction could later result in a dispute that the parties litigate or settle. Similarly here, the MPAP provides a framework for dispute resolution. If Qwest and respondent disagreed as to Qwest's obligation in a particular circumstance to pay money into the Tier 2 Special Fund, and that disagreement were resolved by litigation or settlement, section 16A.151 might require that the money recovered after such litigation or settlement be deposited in the general fund (though that issue is not before us today). But money deposited voluntarily by Qwest, under the self-executing remedies by which it agreed to abide in its application to the FCC and its interconnection agreements with CLECs, is not money recovered in settlement or litigation, but merely by

Qwest's compliance with the terms of its own agreements.

Because we conclude that the money in the Tier 2 Special Fund is not "[m]oney recovered . . . in litigation or in settlement of a matter that could have resulted in litigation," section 16A.151 does not require that the money be deposited in the general fund.

## II. Departure from Precedent

 Relator also argues that respondent's decision was arbitrary and capricious because respondent departed from its own precedent. "An administrative agency concerned with furtherance of the public interest is not bound to rigid adherence to precedent." *In re Review of the 2005 Annual Automatic Adjustment of Charges for All Elec. & Gas Utils.*, 768 N.W.2d 112, 120 (Minn.2009) (*2005 Review*) (quotation omitted). But an agency may not "abandon its own precedent without reason or explanation." *Id.* (quotation omitted). "[A]n agency must generally conform to its prior norms and decisions or, to the extent that it departs from its prior norms and decisions, the agency must set forth a reasoned analysis for the departure that is not arbitrary and capricious." *Id.* A decision is arbitrary and capricious if the agency:

> (a) relied on factors not intended by the legislature; (b) entirely failed to consider an important aspect of the problem; (c) offered an explanation that runs counter to the evidence; or (d) the decision is so implausible that it could not be explained as a difference in view or the result of the agency's expertise.

*Id.* at 118 (quotation omitted).

Relator argues that respondent's decision was arbitrary and capricious because it did not set forth a reasoned analysis for its departure from its prior application of section 16A.151 in two cases: *In re Appli-cation for Approval of the Merger of Northern States Power Co. and New Century Energies, Inc.*, MPUC Docket No. E, G–002/PA–99–1031 (May 26, 2005 order) (*NSP Merger*), and *In re Qwest Corp.'s Alternative Form of Regulation (AFOR) Plan*, MPUC Docket No. P–421/AR–97–1544, 2006 WL 1005129 (Oct. 23, 2003 order; Aug. 4, 2005 order; Jan. 20, 2006 order) (*Qwest's AFOR Plan*).

NSP Merger involved the disposition of $100,000 in penalty money owed by Northern States Power Co. (NSP) under a stipulated agreement between NSP and the Attorney General's Office (OAG) that was made a condition of the Minnesota Public Utilities Commission's approval of NSP's merger. Among other things, the agreement addressed service-quality issues. NSP acknowledged that it had not met the service-quality standard that would allow it to avoid payment of the $100,000 penalty and sought the commission's guidance as to the disposition of the money. The OAG also filed comments. NSP and the OAG agreed that, although section 16A.151 applied, the exception in subdivision 2(a) also applied, which provides that if a state official litigates or settles on behalf of specific injured persons, money may be distributed to those specific injured persons rather than to the general fund. No one argued that section 16A.151 might not apply. The commission agreed with the parties, directing distribution of the penalty money to the affected customers under section 16A.151, subdivision 2(a).

NSP Merger is distinguishable from the case now before us. In NSP Merger, the stipulated agreement was a "settlement" between the OAG and NSP within the meaning of section 16A.151. The agreement was a condition of the commission's approval of the merger, which "was approved because, among other things, it contained assurances that the merged

company's customers would receive service at a particular standard and that the merged company would incur financial consequences for failure to meet those standards." The agreement was part of the settlement of the administrative litigation commenced by NSP to gain commission approval of its merger and distribution of the $100,000 penalty owed to its customers.

Here, the MPAP was not a settlement of litigation. The MPAP in this case was created prior to Qwest's section 271 application to the FCC to provide assurances to the FCC that Qwest would continue to comply with its obligations under the 1996 Act after its application was approved. Because NSP Merger does not constitute on-point precedent in this case, respondent did not arbitrarily and capriciously depart from existing precedent simply because it did not explain why it was not following NSP Merger.

The case of *Qwest's AFOR Plan* involved the disposition of penalty payments made by Qwest (or its predecessor U.S. West) under an alternative-form-of-regulation (AFOR) plan adopted by the commission and Qwest. The AFOR plan required Qwest to make stipulated payments when it failed to meet specified retail service-quality standards. On October 23, 2003, the commission ordered that section 16A.151 required that the money be deposited in the general fund because particular injured parties could not be readily located or identified. On August 4, 2005, the commission reversed course, stating that section 16A.151 did not apply because "[t]he funds in question were not recovered from litigation or settlement, but are the result of a plan arising from statutorily-defined regulatory process of negotiation that involved U.S. West, the Department [of Commerce] and various other parties, under the Commission's supervision." On

January 20, 2006, the commission stated that its August 4, 2005 ruling "was premature." But the commission retained its position that section 16A.151 did not apply to the money because the AFOR plan became effective in 1999, prior to section 16A.151's 2001 adoption, and the legislature had not expressed a clear intent that the section should be retroactively applied.

█ Relator argues that the October 23, 2003 order in *Qwest's AFOR Plan* is precedent that respondent should have followed in this case, but that the contrary August 4, 2005 order is not precedent because it was abrogated by the January 20, 2006 order. Respondent counters that, in light of the January 20, 2006 order, neither of the previous orders is precedential. We agree with respondent. In *Qwest's AFOR Plan*, any precedent on the issue of section 16A.151's application to funds recovered under Qwest's AFOR plan is found in the commission's January 20, 2006 order, which states that "[i]t is not necessary to determine whether § 16A.151 governs AFOR service quality plans in general because it is clear that § 16A.151 does not apply to this AFOR in particular," because the AFOR plan predates the statute. The commission's January 20, 2006 order overrules the October 23, 2003 order that section 16A.151 applies, as well as the August 4, 2005 order that the section does not apply. Because the October 23, 2003 order in *Qwest's AFOR Plan* does not constitute on-point precedent in this case, respondent did not arbitrarily and capriciously depart from existing precedent simply because it did not explain why it was not following *Qwest's AFOR Plan*.

█ But even if respondent's decision in this case were a departure from its prior norms and decisions applying section 16A.151—and we conclude that it was not—respondent was required only to set forth a reasoned analysis for the departure

that was not arbitrary and capricious. *See 2005 Review,* 768 N.W.2d at 120. The issue addressed by respondent in this case—whether section 16A.151 requires respondent to deposit the balance of tier–2 money in the general fund—was a purely legal issue involving the interpretation of the words in a statute. *See St. Otto's Home,* 437 N.W.2d at 39–40. Respondent explained its decision and provided legal analysis in its order. Moreover, relator has failed to show how, in its decision and analysis, respondent relied on factors not intended by the legislature, failed to consider an important aspect of the problem, or offered an explanation running counter to the evidence or that was implausible. More importantly, as discussed above, respondent reached the correct legal conclusion in this case. Therefore, even if respondent's decision in this case departed from its precedent, we would not reverse.

## DECISION

The balance of money in the Tier 2 Special Fund was not money recovered in litigation or in settlement of a matter that could have resulted in litigation. Respondent therefore correctly determined that Minn.Stat. § 16A.151 did not require that the money be deposited in the state's general fund.

**Affirmed.**