*This opinion will be unpublished and may not be cited except as provided by Minn. Stat. § 480A.08, subd. 3 (2012).*

**STATE OF MINNESOTA
IN COURT OF APPEALS
A13-2174**

George E. Antrim, III, PLLC,
Appellant,

vs.

Samar Sabri
a/k/a Samar M. Tomala a/k/a Samar Meri Tomala
a/k/a Samar Meri Toumalah, et al.,
Respondents.

**Filed September 29, 2014
Affirmed in part, reversed in part, and remanded
Schellhas, Judge**

Hennepin County District Court
File No. 27-CV-11-25375

George E. Antrim, III, George E. Antrim, III, PLLC, Minneapolis, Minnesota; and

John H. Daniels, Jr., Willeke & Daniels, Minneapolis, Minnesota (for appellant)

Jordan S. Kushner, Law Office of Jordan S. Kushner, Minneapolis, Minnesota (for respondents)

Considered and decided by Worke, Presiding Judge; Schellhas, Judge; and Harten, Judge.[*]

---

[*] Retired judge of the Minnesota Court of Appeals, serving by appointment pursuant to Minn. Const. art. VI, § 10.

**SCHELLHAS**, Judge

In this dispute about nonpayment of attorney fees and disbursements, appellant argues that the district court erred by denying its breach-of-contract claim, statutory attorney lien, and fraudulent-transfer claim. We affirm the district court's award of appellant's unreimbursed disbursements in the amount of $40,390.38. We reverse the court's denial of appellant's breach-of-contract claim, statutory attorney lien, and fraudulent-transfer claim and remand for proceedings consistent with this opinion.

**FACTS**

Excelsior Development, LLC, owned a Minneapolis retail center, and its members were respondent Samar Sabri (38%), respondent Azzmi Sabri (31%), and John Bergin (31%). This case arose as a result of unpaid attorney fees of more than $350,000 and unreimbursed disbursements of more than $41,000 billed by appellant George E. Antrim, III, PLLC, in the course of its representation of Azzam Sabri and Samar Sabri (Sabris), husband and wife, in a lawsuit regarding Samar Sabri's interest in Excelsior (the Excelsior lawsuit). Samar Sabri acquired her membership units in Excelsior by transfer from Azzam Sabri, who is now deceased.[1] Azzmi Sabri is the brother of Azzam Sabri.

Azzam Sabri sought Antrim's legal representation because he believed that Azzmi Sabri and Bergin had been freezing him out of Excelsior. Although Azzam Sabri no longer owned any membership units in Excelsior, he made all of the business decisions

---

[1] Why Azzam Sabri transferred his membership units in Excelsior to Samar Sabri is not clear in the record and of no consequence to the legal issues involved in this appeal.

2

regarding Samar Sabri's interest in Excelsior. Samar Sabri never played an active role in the management of Excelsior and trusted her husband to make all the decisions about the Excelsior lawsuit. Azzam Sabri agreed to pay Antrim and gave Antrim a $40,000 retainer, but Sabris did not sign Antrim's proposed retainer agreement. Despite not having a signed retainer agreement, Antrim commenced the Excelsior lawsuit on Sabris' behalf in June 2008 because Sabris' claims were nearing expiration under the applicable statutes of limitations. Sabris were plaintiffs, and the defendants included Excelsior, Azzmi Sabri, and Bergin. Sabris' claims included derivative claims, breach of contract, breach of fiduciary duty, unjust enrichment/restitution, intentional misrepresentation, negligent misrepresentation, and aiding and abetting conspiracy.

During the pendency of the Excelsior lawsuit, Antrim provided Azzam Sabri with bills for attorney fees and costs, reflecting its hourly attorney rate of $275, which increased to $300 in January 2009. From time to time, Antrim attempted to secure Sabris' signatures on an attorney-fee agreement, even offering to convert the representation to a contingency-fee arrangement, but Sabris never signed an agreement.

In August 2009, intending to pursue settlement of the Excelsior lawsuit, Antrim and Azzam Sabri obtained an appraisal of Excelsior's retail center. It appraised at $5,400,000, and Sabris offered to settle their lawsuit by selling Samar Sabri's membership units in Excelsior to the Excelsior defendants for $1,500,000. The Excelsior defendants counter-offered for $1,000,000, but the parties did not reach an agreement. In August 2010, the district court dismissed some of Sabris' claims on summary judgment.

In November 2010, Antrim again unsuccessfully pursued settlement through a buyout of Samar Sabri's membership units. In May 2011, the district court orally dismissed Sabris' remaining claims. Azzam Sabri had been ill for some time and, in June, his condition became more serious. In July, the court formally dismissed Sabris' remaining claims. On August 3, Azzam Sabri, who was gravely ill, instructed Antrim to appeal, but Samar Sabri indicated that Antrim should call Basim Sabri, Azzam's brother. Antrim repeatedly attempted to contact both Basim Sabri and Samar Sabri without success. On August 11, with the assistance of other legal counsel and without notice to Antrim, Samar Sabri signed an agreement for the sale of her Excelsior membership units to Azzmi Sabri for $1,300,000 in cash plus unrelated real estate, mutual release of claims, and dismissal with prejudice of the Excelsior lawsuit. On August 21, Azzam Sabri died.

On August 26, 2011, unaware that Samar Sabri had agreed to dismiss the Excelsior lawsuit, Antrim appealed the district court's dismissal and executed a notarized attorney-lien notice regarding Samar Sabri's Excelsior membership units. On October 11, Antrim received a copy of Samar Sabri's affidavit, which she filed with this court, and in which she stated that Antrim appealed without her consent or direction and that Azzam Sabri told her shortly before his death that he did not want the litigation to continue. On October 27, Antrim noticed dismissal of the appeal, explaining that Samar Sabri failed to respond to his calls, letters, and other efforts to contact her. This court dismissed the appeal on November 1. *Sabri v. Bergin, et al.*, *Sabri, et al.*, No. A11-1535 (Minn. App. Nov. 1, 2011) (order).

Sabris paid only $45,000 on Antrim's bills for attorney fees and disbursements—the $40,000 retainer and a $5,000 payment for disbursements. Antrim sued Samar Sabri for breach of contract, account stated, and unjust enrichment, sued Samar Sabri and Azzmi Sabri for fraudulent transfer, and sought to foreclosure its attorney lien. After a bench trial, the court awarded Antrim $40,390.38 for unreimbursed disbursements and otherwise denied Antrim's claims and requests. The court denied Antrim's new-trial motion and, except for minor corrections, denied its amended-findings motion.

This appeal follows.

### D E C I S I O N

After a bench trial, appellate courts review factual findings for clear error and equitable determinations for abuse of discretion, *see City of N. Oaks v. Sarpal*, 797 N.W.2d 18, 23–24 (Minn. 2011), giving "'due regard . . . to the opportunity of the trial court to judge the credibility of the witnesses,'" *Runia v. Marguth Agency, Inc.*, 437 N.W.2d 45, 48 (Minn. 1989) (quoting Minn. R. Civ. P. 52.01). Factual findings are not clearly erroneous unless, when the evidence is "view[ed] . . . in the light most favorable to the verdict," they are unsupported by "reasonable evidence" and "le[ave an appellate court] with the definite and firm conviction that a mistake has been made." *Rasmussen v. Two Harbors Fish Co.*, 832 N.W.2d 790, 797 (Minn. 2013) (quotations omitted).

Noting that "Antrim laid painstaking foundation for the bills and for the amount billed," the district court found that Antrim's total attorney fees and disbursements were $359,360.88 in excess of the $40,000 paid as a retainer and the $5,000 later paid toward

disbursements.[2] And, significantly, the court also found that "[t]he expenses and fees incurred and paid were reasonable given the nature and scope of the case" and that "[t]he evidence presented at . . . trial explained the necessity of the expenses incurred and disbursements made." But the court awarded Antrim no attorney fees and only $40,390.38 in claimed disbursements, basing that award on Antrim's "implied contract of representation" with Samar Sabri. The court's award left Antrim uncompensated for $312,895.50 in attorney fees and disbursements billed in connection with the three-year Excelsior lawsuit.

Antrim argues that the district court erred by rejecting its breach-of-contract, account-stated, and unjust-enrichment claims. We agree.

### Claims for Attorney Fees and Disbursements

#### Breach of Contract

"[W]hen a fee agreement is fairly entered into with the client and involves no fraud by the attorney, it is as valid and binding as other contracts not involving a fiduciary." *Kittler & Hedelson v. Sheehan Props., Inc.*, 295 Minn. 232, 235, 203 N.W.2d 835, 838 (1973). "The essentials of such contracts, whether oral or written, express or implied, are the same as any other contracts." *Id.* "The elements of a breach of contract claim are (1) formation of a contract, (2) performance by plaintiff of any conditions precedent to his right to demand performance by the defendant, and (3) breach of the

---

[2] Of the $359,360.88 in attorney fees billed, the district court found that $6,075 related to a default-judgment matter that was separate from the Excelsior lawsuit.

contract by defendant." *Lyon Fin. Servs., Inc. v. Ill. Paper & Copier Co.*, 848 N.W.2d 539, 543 (Minn. 2014) (quotation omitted).

The district court found that no provision of Samar Sabri's implied contract with Antrim made her liable to pay Antrim's legal fees. Antrim argues that the evidence clearly shows the existence of an effective agreement with Samar Sabri from the beginning of Antrim's representation of Sabris that required the payment of Antrim's hourly rate in return for Antrim's legal representation in the Excelsior lawsuit. Antrim's argument is persuasive.

"A contract implied in fact is in all respects a true contract" and "requires a meeting of the minds the same as an express contract." *Roberge v. Cambridge Coop. Creamery*, 248 Minn. 184, 188, 79 N.W.2d 142, 145–46 (1956); *see also McIntosh Cnty. Bank v. Dorsey & Whitney, LLP*, 745 N.W.2d 538, 549 (Minn. 2008) ("[R]eliance on an implied contract does not relieve a plaintiff from his burden of establishing all essential contractual ingredients." (quotation omitted)). "[T]he law may imply a contract from the circumstances or acts of the parties" when the parties "manifest[] . . . mutual assent." *Bergstedt, Wahlberg, Berquist Assocs. v. Rothchild*, 302 Minn. 476, 479, 225 N.W.2d 261, 263 (1975). "Mutual assent entails a meeting of the minds concerning a contract's essential elements," and "[w]hether mutual assent exists is tested under an objective standard." *SCI Minn. Funeral Servs. v. Washburn-McReavy Funeral Corp.*, 795 N.W.2d 855, 864 (Minn. 2011) (quotation omitted).

The evidence proves that Sabris agreed to pay attorney fees and disbursements in connection with the Excelsior lawsuit, based on Antrim's hourly rate. After receiving

7

Antrim's proposed retainer agreement that provided for a $275 attorney-fee hourly rate, Sabris paid Antrim a $40,000 retainer. Antrim thereafter gave Azzam Sabri more than 25 bills, either by hand or mail, detailing the legal services provided, the $275 hourly rate charged, and the set-off against the retainer paid. The bills reflect that the hourly rate increased to $300 in January 2009. *See Kittler*, 295 Minn. at 235, 203 N.W.2d at 838 ("Even if the amount of compensation is altered after commencement of the employment, that fact by itself will not invalidate the contract. . . . [A]greements made after services have been rendered should be closely scrutinized to see that there has been no overreaching and that the client was fully informed." (citation omitted)); *Holt v. Swenson*, 252 Minn. 510, 515, 90 N.W.2d 724, 728 (1958) ("Courts are reluctant to invoke the principle that indefiniteness prevents the creation of a contract where a just result, consistent with a reasonably expressed intent of the parties, can be reached by upholding the agreement."). Neither Azzam Sabri nor Samar Sabri ever complained about the legal services provided or objected to the attorney fees or disbursements billed until Samar Sabri answered Antrim's complaint in this case. *See Holt*, 252 Minn. at 515–16, 90 N.W.2d at 728 ("Even if we assume that defendant remained silent at the time of the offer and subsequent thereto, he must be deemed to have accepted the offer since he encouraged the defendant to continue the pursuit of his claims, knowing of plaintiff's offer made under circumstances under which plaintiff was justified in expecting a reply.").

The district court concluded that Samar was not liable for the conduct of Azzam, reasoning that "his actions did not automatically bind her legally." We disagree. In

8

*Knappen v. Freeman*, a case involving unauthorized acts by one spouse, the supreme court rejected the wife's argument that her husband's representations did not bind her, even though she "did nothing whatever personally in the matter until, by executing the conveyance, she accepted and availed herself of the results of the negotiations of her husband and [a real-estate agent]." 47 Minn. 491, 495, 50 N.W. 533, 534 (1891). The supreme court reasoned that "[w]hen one adopts the unauthorized act of another made in h[er] behalf, and receives the benefits accruing therefrom, [s]he is held to adopt and ratify the instrumentalities by which the fruits were obtained." *Id.* (quotation omitted). The supreme court noted that the wife "not only accepted the negotiations of her husband and [the agent] in her behalf, but she [was] insisting upon appropriating the benefits thereof." *Id.*

> Ratification occurs when one, having full knowledge of all the material facts, confirms, approves, or sanctions, by affirmative act or acquiescence, the originally unauthorized act of another, thereby creating an agency relationship and binding the principal by the act of his agent as though that act had been done with prior authority.

*Anderson v. First Nat'l Bank of Pine City*, 303 Minn. 408, 410, 228 N.W.2d 257, 259 (1975).

Here, the district court found that Samar Sabri was "acutely aware of the work Antrim was doing for her and her husband" and that "she accepted [Antrim]'s services." *Cf. C.I.R. v. Bollinger*, 485 U.S. 340, 349, 108 S. Ct. 1173, 1179 (1988) (stating that "the law of agency . . . permits agents to be unpaid family members," disagreeing that it requires "arm's-length dealing plus agency fee"); *Wojahn v. Faul*, 242 Minn. 33, 40, 64

9

N.W.2d 140, 145 (1954) (concluding that husband's acts bound wife in real-estate transaction "under elementary principles of agency" in light of wife's testimony that her husband "'t[oo]k[] care of the business,'" "'took care of everything,'" and "'did all the writing,'" and that she "'never looked at any letters'"); Restatement (Second) of Agency § 22, cmt. b. (1958) ("[A] husband habitually permitted by his wife to attend to some of her business matters may be found to have authority to transact all her business affairs."). The record clearly reflects that Samar Sabri accepted and encouraged Antrim's ongoing legal services in connection with the Excelsior lawsuit over the course of more than three years. Nothing in the record suggests that Azzam Sabri's acts in securing Antrim's representation for Sabris were unauthorized by Samar Sabri. And, even if so, Samar Sabri authorized her husband's acts. We conclude that Sabris had an implied contract that required Samar Sabri to pay Antrim for its legal services and disbursements, and we reverse and remand for the district court to determine Antrim's damages for breach of contract.

*Account Stated*

"[A]n account can be stated between an attorney and client . . . ." *Kittler*, 295 Minn. at 237, 203 N.W.2d at 839. When an account is stated, "the law will imply a promise to pay whatever balance is . . . acknowledged to be owing and due," and

> proof of the retention of a statement of account without objection for more than a reasonable length of time may under certain circumstances operate as proof of an acquiescence in or an admission of the correctness of the statement of account and permit the legal inference that an account stated has been established.

*Id.* at 237–38, 203 N.W.2d at 839 (quotation omitted).

Neither Azzam Sabri nor Samar Sabri ever objected to the detailed bills provided by Antrim. We are unpersuaded by the district court's concern that most of the bills were addressed only to Azzam Sabri. Sabris lived together, and Antrim mailed or delivered many of the bills to Sabris' home, where Antrim often met with Azzam Sabri while Samar Sabri was home. *Cf. Sariol v. James P. McDonald Co.*, 127 A.D. 648, 649 (N.Y. 1908) ("An account stated [is] simply an agreement between parties . . . , [and] such agreement need not necessarily be made by the parties personally, but may be made in behalf of either party by an agent having authority."). And, while regularly receiving the bills without objection, Azzam Sabri continually encouraged Antrim to pursue the Excelsior lawsuit. Even if Antrim were not entitled to damages for breach of contract, we conclude that it is entitled to damages based on the account stated between Antrim and Sabris.

*Quantum Meruit*

In essence, an award in quantum meruit is an unjust-enrichment award. *Sharp v. Laubersheimer*, 347 N.W.2d 268, 271 (Minn. 1984); *see also Caldas v. Affordable Granite & Stone, Inc.*, 820 N.W.2d 826, 838 (Minn. 2012) ("Unjust enrichment is an equitable doctrine that allows a plaintiff to recover a benefit conferred upon a defendant when retention of the benefit is not legally justifiable.").

> To establish an unjust enrichment claim, the claimant must show that the defendant has knowingly received or obtained something of value for which the defendant in equity and good conscience should pay. Unjust enrichment claims do not lie simply because one party benefits from the efforts

11

> or obligations of others, but instead it must be shown that a party was unjustly enriched in the sense that the term unjustly could mean illegally or unlawfully.

*Id.* (quotation omitted).

"The relation of attorney and client does not preclude the latter from settling and compromising the matters in litigation in his own way, and without the knowledge or consent of the attorney . . . ." *Krippner v. Matz*, 205 Minn. 497, 507, 287 N.W. 19, 25 (1939) (quotation omitted). But "courts are generally agreed that in the absence of a contract or statute fixing the amount of the compensation, a lawyer performing legal services for his client is entitled to recover the reasonable value of those services . . . ." *Meagher v. Kavli*, 251 Minn. 477, 494, 88 N.W.2d 871, 883 (1958); *see also Desaman v. Butler Bros.*, 118 Minn. 198, 201, 136 N.W. 747, 748 (1912) (*Desaman II*) ("[A] client has always the right to settle his cause of action and stop litigation at any stage of the proceeding, subject, however, to the right of the attorney to receive compensation for services rendered.") The attorney's right to recover the reasonable value of the attorney's services is a right based on quantum meruit. *See, e.g.*, *Nordling v. N. States Power Co.*, 478 N.W.2d 498, 501 (Minn. 1991) ("The discharged attorney is entitled to recover in only quantum meruit for services rendered to the time of discharge . . . ."); *Stall v. First Nat'l Bank of Buhl*, 375 N.W.2d 841, 845–46 (Minn. App. 1985) ("An attorney on a contingent fee arrangement who is discharged by his client is entitled to compensation for the reasonable value of his services, based on quantum meruit . . . .").

Here, despite finding that Antrim "provided extensive legal services to" Sabris, the district court denied Antrim's unjust-enrichment claim. The court reasoned that Samar

12

Sabri did not "benefit financially from the legal work" and was not unjustly enriched by Azzmi Sabri's agreement to release his claims and to pay Samar Sabri $1,300,000 by way of a real-estate transfer and cash payments over ten years in exchange for Samar Sabri's membership units in Excelsior and her release of claims.[3] The court found that the sale of Samar Sabri's membership units to Azzmi Sabri "was basically a family arrangement forced on Azzmi [Sabri]" and that "[t]his sale agreement was not a 'settlement' of the Excelsior [lawsuit]." We disagree. We conclude that the substance of the August 11, 2011 agreement between Samar Sabri and Azzmi Sabri, an Excelsior defendant, constituted a settlement of the Excelsior lawsuit through which Samar Sabri clearly intended to benefit financially.

"A settlement is an agreement ending a dispute or lawsuit." *In re Qwest's Performance Assur. Plan*, 783 N.W.2d 571, 577 (Minn. App. 2010) (quotation omitted). On August 11, when Azzmi Sabri and Samar Sabri reached their agreement, an appeal from the district court's dismissal of the Excelsior lawsuit was pending in this court. Indeed, the district court found that "Azzam [Sabri] directed Antrim to file an appeal of the dismissal." The court also found that "dismissal of the [Excelsior] lawsuit was included as a condition," but the court determined that it "was not truly central to the arrangement." The evidence does not support that determination. In the agreement, Azzmi Sabri and Samar Sabri mutually released each other of all Excelsior-lawsuit-

---

[3] The agreement provided that Samar Sabri would receive $1,300,000, including a $150,000 home and $1,150,000 paid in 120 monthly installments of $7,000 and a final, lump-sum payment of $310,000.

related claims; they agreed to "take all action necessary to dismiss [the Excelsior lawsuit] with prejudice"; and they agreed that dismissal of the [Excelsior] lawsuit with prejudice was a condition precedent to closing.

Samar Sabri received the benefit of Antrim's legal services for more than three years. Even if Antrim were not entitled to damages for breach of contract or based on the account stated between Antrim and Sabris, we conclude that it is entitled to recover the reasonable value of its attorney services and disbursements based on quantum meruit to prevent Samar Sabri's unjust enrichment. *See Meagher*, 251 Minn. at 494, 88 N.W.2d at 883 ("[A] lawyer performing legal services for his client is entitled to recover the reasonable value of those services . . . ."); *see also Krippner*, 205 Minn. at 507, 287 N.W. at 25 ("Where the client exercises his legal right to settle with his adversary, in good faith and without purpose to defraud the attorney out of his compensation, the latter may recover only the reasonable value of the services rendered by him down to the time of the settlement." (quotation omitted)).

The district court is most "familiar with all aspects of the action from its inception through posttrial motions" and therefore is in the best position on remand to evaluate the reasonableness of the requested attorney fees. *Anderson v. Hunter, Keith, Marshall & Co.*, 417 N.W.2d 619, 629 (Minn. 1988); *see also Vandeputte v. Soderholm*, 298 Minn. 505, 511, 216 N.W.2d 144, 148 (1974) ("[T]he determination of the reasonable value of legal services involves a question of fact to be answered in the light of the peculiar circumstances of each individual case." (quotation omitted)); *Kittler*, 295 Minn. at 236–37, 203 N.W.2d at 839 (setting forth factors for consideration in determining attorney

14

fees); *Busch v. Model Corp.*, 708 N.W.2d 546, 552 (Minn. App. 2006) ("Determination of the 'reasonable value' can be based on the contract price, even though recovery is sought in equity.").

### Attorney Lien

Antrim seeks to foreclose its attorney lien on the Excelsior membership units that Samar Sabri transferred to Azzmi Sabri under their August 11, 2011 agreement. Antrim argued to the district court that it was entitled to recover its attorney fees based on its attorney lien on the causes of action asserted in the Excelsior lawsuit. The district court did not address this argument, concluding instead that Antrim has no attorney lien on the Excelsior membership units. Antrim argues that it has a lien on the causes of action underlying the Excelsior lawsuit and against Samar Sabri's Excelsior membership units, which she transferred to Azzmi Sabri. We agree.

"An attorney lien traces its origins to common law, but the Minnesota legislature has long since preempted this field and has substituted statutory procedures." *Dorsey & Whitney LLP, v. Grossman*, 749 N.W.2d 409, 420 (Minn. App. 2008) (quotation omitted). "An attorney lien is an equitable lien created to prevent a client from benefiting from an attorney's services without paying for those services." *Id.*

> An attorney has a lien for compensation *whether the agreement for compensation is expressed or implied* (1) upon the cause of action from the time of the service of the summons in the action, or the commencement of the proceeding, and (2) upon the interest of the attorney's client in any money or property involved in or affected by any action or proceeding in which the attorney may have been employed, from the commencement of the action or

15

> proceeding, and, as against third parties, from the time of filing the notice of the lien claim, as provided in this section.

Minn. Stat. § 481.13, subd. 1(a) (2012) (emphasis added). "The lien granted under subdivision 1(a), is an inchoate lien that *attaches at the commencement of the legal representation to the cause of action* or the client's interest in 'any money or property involved in or affected by any action or proceeding in which the attorney may have been employed.'" *Dorsey*, 749 N.W.2d at 420 (quoting Minn. Stat. § 481.13, subd. 1(a) (2006)) (emphasis added). The lien "may be established, and the amount of the lien may be determined, summarily by the court under this paragraph on the application of the lien claimant or of any person or party interested in the property subject to the lien." Minn. Stat. § 481.13, subd. 1(c) (2012). "The resulting judgment is in the nature of a declaratory judgment that establishes the lien, as defined by the district court with regard to the lienholder, the subject, and the amount." *Dorsey*, 749 N.W.2d at 422. "This lien exists until it is satisfied or released . . . ." *Desaman v. Butler Bros.*, 114 Minn. 362, 364, 131 N.W. 463, 464 (1911) (*Desaman I*); *see Williams v. Dow Chem. Co.*, 415 N.W.2d 20, 26 (Minn. App. 1987) (concluding that lien, once formed, is not extinguished until satisfied and that entry of judgment on underlying cause of action has no effect on lien's validity).

The attorney lien on a client's cause of action "prevent[s] a client from benefiting from an attorney's services without paying for them and provides security for recovery of fees." *Sanvik v. Sanvik*, 850 N.W.2d 732, 737 (Minn. App. 2014); *see Barnes v. Verry*, 154 Minn. 252, 255, 191 N.W. 589, 590 (1923) ("[A] party to a cause may not run away with the fruits of his attorney's industry and ability without satisfying the attorney's just

16

demands."). Moreover, "the paying defendant" is subject to enforcement of that lien when the defendant "pay[s] . . . a claim [in a settlement] without the plaintiff's lawyer's consent." *Williams*, 415 N.W.2d at 26; *see Krippner*, 205 Minn. at 502, 287 N.W. at 22–23 ("[T]he defendant is held liable to the attorney for the amount of his lien if settlement is made in disregard of the attorney's rights. The defendant in any such case is bound to take notice of the attorney's rights under his statutory lien."); *Kubu v. Kabes*, 142 Minn. 433, 437, 172 N.W. 496, 497 (1919) ("[Defendant] was charged with notice of the lien, and it is immaterial that he paid the amount of the settlement to the plaintiff in good faith. Since he had notice of the lien he must pay again." (citation omitted)).

In this case, the district court erroneously concluded that Antrim's attorney lien did not attach to Samar Sabri's Excelsior membership units because insufficient evidence proved that Antrim served Samar Sabri with the notice of attorney lien. Nothing in Minnesota Statutes section 481.13 (2012) required such service. The court also erroneously concluded that Antrim's attorney lien did not attach to the Excelsior membership units after their transfer to Azzmi Sabri. The court reasoned that, because Azzmi Sabri was a "third party" in the Excelsior lawsuit and Antrim did not file notice of the lien until 15 days after the August 11, 2011 agreement, Azzmi Sabri received Samar Sabri's membership units not subject to Antrim's attorney lien. *See* Minn. Stat. § 481.13, subd. 1(a) (providing that attorney has lien on property, "as against third parties, from the time of filing the notice of the lien claim"). But Azzmi Sabri was not a third party in the Excelsior lawsuit; he was an Excelsior defendant and therefore received the membership units subject to Antrim's attorney lien. *See Williams*, 415 N.W.2d at 26 ("Dow . . . was a

17

defendant in the federal litigation and not a 'third party' for purposes of the attorney's lien statute."). Based on the evidence in this case, we note with approval Antrim's cite to the supreme court's language in *Desaman I*, as follows:

> This looks like a case where an attorney has been deliberately beaten out of his fees by a collusive settlement in fraud of his rights. It is hardly conceivable that defendant's attorneys did not know that plaintiff's attorney had an unpaid claim for services, and the result of the settlement would be to deprive him of all compensation in the case.

114 Minn. at 363–64, 131 N.W. at 464.

We conclude that Antrim's attorney lien attached to Samar Sabri's causes of action and to her Excelsior membership units at the commencement of Antrim's legal representation in the Excelsior lawsuit and that Azzmi Sabri received Samar Sabri's membership units subject to Antrim's attorney lien. *See Williams*, 415 N.W.2d at 26–27 ("[T]he payment of a claim without the plaintiff's lawyer's consent makes the paying defendant subject to the enforcement of the attorney's lien."). But we disagree with Antrim that, because of its attorney liens, the district court erred by not ordering Samar Sabri and Azzmi Sabri to pay the unpaid attorney fees.

An attorney lien provided for by section 481.13, subdivision 1(a), is "an inchoate lien." *Dorsey*, 749 N.W.2d at 420. "To make the lien choate, an attorney may petition the district court to summarily establish the lien." *Id.* at 420–21. "Establishment of the lien is the district court's recognition of the client's debt to the attorney and effects a hold or claim on the client's property as security for the debt." *Id.* at 421 (quotation omitted). "The resulting judgment is in the nature of a declaratory judgment that establishes the

18

lien, as defined by the district court with regard to the lienholder, the subject, and the amount." *Id.* at 422.

We reverse and remand for the district court to order entry of judgment establishing Antrim's liens as to the causes of action and membership units, consistent with this opinion and section 481.13, subdivision 1(c). *See id.* at 422 ("[W]hen a lien claimant petitions the district court under section 481.13, subdivision 1(c), the district court must determine (1) the lienholder; (2) the subject of the lien as defined by the attorney-lien statute; and (3) the amount due.").

### *Fraudulent Transfer*

Antrim argues that the district court erred by finding that Samar Sabri's transfer of her Excelsior membership units to Azzmi Sabari was not fraudulent. We agree. Minnesota Statutes sections 513.41−.51 (2012) constitute Minnesota's Uniform Fraudulent Transfer Act (MUFTA). "MUFTA's purpose is . . . to prevent debtors from placing property that is otherwise available for the payment of their debts out of the reach of their creditors." *Citizens State Bank v. Brown*, 849 N.W.2d 55, 60 (Minn. 2014). When a debtor fraudulently transfers property, a creditor has remedies including "avoidance of the transfer or obligation to the extent necessary to satisfy the creditor's claim" and "an attachment or other provisional remedy against the asset transferred." Minn. Stat. § 513.47(a)(1)–(2). A creditor is "a person who has a claim," and a claim is "a right to payment, whether or not the right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured." Minn. Stat. § 513.41(3)–(4).

A transfer "is fraudulent as to a creditor . . . if the debtor made the transfer . . . with actual intent to hinder, delay, or defraud any creditor of the debtor." Minn. Stat. § 513.44(a)(1). Whether the debtor actually had fraudulent intent turns on the following factors, known as "badges of fraud," *Citizens State Bank*, 849 N.W.2d at 60:

> (1) the transfer or obligation was to an insider;
>
> (2) the debtor retained possession or control of the property transferred after the transfer;
>
> (3) the transfer or obligation was disclosed or concealed;
>
> (4) before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit;
>
> (5) the transfer was of substantially all the debtor's assets;
>
> (6) the debtor absconded;
>
> (7) the debtor removed or concealed assets;
>
> (8) the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred;
>
> (9) the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred;
>
> (10) the transfer occurred shortly before or shortly after a substantial debt was incurred; and
>
> (11) the debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor.

Minn. Stat. § 513.44(b). "The presence of a single badge of fraud may, but does not necessarily, prove fraudulent intent. The presence of several badges of fraud, however,

creates an inference of fraud that requires clear evidence of a legitimate purpose to rebut." *Citizens State Bank*, 849 N.W.2d at 66 (citations omitted). Although "[w]hether a debtor made a transfer with fraudulent intent is ordinarily a question of fact," the issue is one of law "when no genuine issue of material fact exists." *Id.* at 65, 66.

The district court found that Samar Sabri's transfer of her Excelsior membership units to Azzmi Sabri was not fraudulent, reasoning that "[i]t was not a secret settlement . . . completed to avoid paying attorney fees to [Antrim]" but, rather, "a family arrangement to provide for Azzam's widow and children" in which Samar Sabri received "significant compensation" constituting "more than the current market value of the asset." Antrim argues that factors (1) through (5) and (9) are present. We are unpersuaded.

We are persuaded that factors (1) and (3) are present and that, as a matter of law, these badges of fraud are sufficient to support a conclusion that Samar Sabri transferred her Excelsior membership units to Azzmi Sabri with the fraudulent intent to place the units out of Antrim's reach. Azzmi Sabri was an insider because he was Samar Sabri's brother-in-law, and insiders include "relative[s] of the debtor." *See* Minn. Stat. §§ 513.44(b)(1), 513.41(7)(i)(A). And Samar Sabri sold the membership units to Azzmi Sabri without telling Antrim about the sale and then concealed the transfer from Antrim. *See* Minn. Stat. § 513.44(b)(3). After transferring the membership shares to Azzmi Sabri, Samar Sabri did not respond to Antrim's repeated attempts to contact her by phone, through letters, and through Azzam Sabri's brothers. Samar Sabri testified that she did

not tell Antrim about the agreement because she considered it to be among her "private matters."

> [T]he very fact of making a settlement behind the back of the attorney suggests collusion. . . . [The opposing party to the client] should . . . know that the attorney, by virtue of his lien, is entitled to be considered. Fairness and common honesty would indicate that settlements of lawsuits should not be engineered in the dark, so as to permit an irresponsible or dishonest party to get away with the fruits of the attorney's work without payment for the services.

*Desaman II*, 118 Minn. at 203, 136 N.W. at 749. Significantly, the district court found that Samar Sabri "was evasive on the stand. She demonstrated a general nature of being intelligent and aware, but demurring to the men in her family for decision making and confrontations." We conclude that Samar Sabri fraudulently transferred her Excelsior membership units to Azzmi Sabri, and we reverse and remand to the district court with instructions to consider appropriate remedies under MUFTA. *See* Minn. Stat. § 513.47 (listing remedies of creditors for fraudulent transfer).

We affirm the district court's grant of judgment to Antrim in the amount of $40,390.38 for its disbursements, plus costs and disbursements as allowed by law, but we reverse the judgment denying Antrim recovery of attorney fees. On remand, the district court must (1) determine and award Antrim breach-of-contract attorney fees, (2) establish attorney liens on the causes of action asserted in the Excelsior lawsuit and on the Excelsior membership units, and (3) determine a proper remedy for Samar Sabri's fraudulent transfer of her Excelsior membership units.

**Affirmed in part, reversed in part, and remanded.**

22